The first case for this morning is Cuff v. Commonwealth of Pennsylvania, number 23-3246. Thank you, your honor. May it please the court, I'm Joshua Cochran. I represent the appellant Brandy Cuff in this matter. At this time, I would request four minutes for rebuttal. That will be granted. Thank you. We have addressed or raised on appeal the trial court's grant of summary judgment in Title VII and PHRA claims for retaliation and for hostile work environment. We have also raised kind of a preliminary issue concerning the propriety of the trial court's grant of permitting the DOC to file a motion for summary judgment five to six after the deadline for the scheduling order. Let's deal with that. I'm interested in that. It seems like a threshold. It seems that your adversary moved, submitted a proposed form of order that made no mention of good cause or anything else, and the judge cited three days before you could respond. First off, you seem to rely on Rule 16. I'm wondering, your adversary happened to point out in the briefs that they happen to cite Rule 6b. Which should apply to this particular matter? It's our intention that Rule 16 does. It's the more specific rule. It deals with the scheduling and deadlines for scheduling orders. In this case, your honor, is correct. There was a scheduling order that had been entered, and that order had expired at least as far as the deadlines for summary judgment on February 8th. Then we were setting the case up for trial, and there was this epiphany, and they decided to go for summary judgment. It is correct that the motion was granted without giving us any chance to weigh in, and that's why the issue was not framed at that level. On the other hand, is this a wheel-spinning exercise? I mean, did you really suffer any prejudice as a result of the judge acting quickly and not finding cause or excusable neglect? I don't believe we did suffer any prejudice besides a lot of time loss, but prejudice isn't part of the analysis anyway. It seems to me that prejudice is a very important part of the analysis. If you look at the Drippy case and the language in that, it says that it is important to consider prejudice when you're considering whether a motion has been timely filed. That is correct under Rule 6, your honor. It is our contention that Rule 16b4 is what And here's part of the problem. Even under Rule 6, and Rule 6 has a standard of excusable neglect, there was nothing in the motion that would have triggered any finding that could have led to excusable neglect. The reasons given were it was an error and a mistake, and while I appreciate the candor, that doesn't add up to the justification under either Rule 6 or Rule 16. Don't you really want a trial in this matter? I mean, it surprises me that you would want this sent back for Judge Brand to enter the same order that he entered. We do want a trial. Well, I don't know why you're pressing this issue for us to remand it at this stage. What's going to happen? Do you need more discovery? No, discovery is closed. But Judge Brand is then going to re-enter the same order that he ordered, and you're going to be back here all over again, aren't you? It's my hope that we would look as well at the other two issues, because frankly, when the judge entered this order, I was concerned. I knew it would lead to a delay. But looking at our evidence, frankly, I didn't think there was any way we'd lose the summary judgment. Well, let's get to the merits then. Okay. And so with respect to that, I was going to touch first on the issue concerning the claim for retaliation. And in that case, the trial court found that we had engaged in protected activity with the report, and that there was causation because there's a very close temporal proximity. He did not find any adverse employment action. And that's where we get into the real problem here, which is the standard of review for summary judgment, which is that we're supposed to get the benefit of the evidence, the facts, and the inferences therefrom. And we lost all of that at the trial court. You're saying he didn't look at it in the light most favorable to your client, correct? Correct. It read like a trial. And frankly, if this was a bench trial, we wouldn't be here, because that's the standard of review. He would have resolved all these issues. But we're not there, and we are entitled to trial. And he largely found that on the basis of a document which Brandy authored on January 9th 2020, which in fairness to the judge, says resign or resignation in three different spots. However, as in all of these instances for resignations or whatever, you have to look at the circumstances. And the circumstances are, on January 2nd of 2020, she makes this sexual harassment complaint to the DOC because she can't handle it anymore. And she's frankly been disabled from work for two days, and it's going to extend into the next month because of this sexual harassment that she's been undergoing since she arrived there for the last seven months. She is, it's suggested at that point that she submit a hardship transfer, and that's by the investigator for the DOC, Stacey Waters. She submits it on the 6th. Isn't it unusual that she didn't mention in her resignation letter that she had asked for a transfer and that she was deciding to resign because she was told that she had to do that to have her transfer application considered? It is an issue. In terms of how I look at that, you can't read this document with an overly technical eye. You have to put it in the context. And the context is this is a woman who's at her wits end from what she's experienced. And she has, in the interim, before she does this document, she has been berated by a local HR rep that she was told to contact. And she was actually told, and this is a huge factor by another HR, local HR rep, Roberta Boyles, that she needs to resign to have that hardship transfer come through. So it is not mentioned in there, but what she does do is she talks constantly. The main tenor of that is these intolerable conditions under which she is suffering, the effect on her as a person, and how she can't turn and can't take it anymore. She also mentions that the purpose of this document and her complaint is to make sure that it does not happen to her in the future. That clearly indicates an intention in that document to remain attached to the DOC. Furthermore... I'll ask you a question. Other than the union meeting incident, what evidence outside of your client's own statement support her hostile work environment claim? The answer to that is it comes from Investigator Stacey Waters and her detailed report. It comes from Lieutenant Sonia Arias, who is a very reluctant witness to testify. I had to drag it out of her. I hate to recommend reading the transcripts, but it's clear that. And as well as a witness we did not depose, and that was Tyrone Garrison. These people were afraid to come forward to corroborate Ms. Cuff's allegations concerning what happened at the as well as the circumstances under which she worked daily. She was shunned. She was referred to as, pardon the expression, a bedazzled twat. And there were these rumors circulating that she was sleeping with officers in order to secure advantageous job assignments. She's new. She's young. Her entire time in the DOC started, I believe, in October of 2018. This isn't someone with an established tenor or anything like that. So when you look at that document, you need to realize that she was fed the term resignation, that that was not necessary for her to have the hardship transfer, that she then qualified it with a statement that she wanted to continue working there, it's implied, as well as the conditions that caused her to do it. Furthermore, neither the DOC nor her considered that or acted like that after the effect that it terminated her tenor. The only thing the DOC did on January 14, 2020, they sent a form letter, quote, confirming her resignation. There's no evidence that she ever received this besides the fact that it was mailed and she, in fact, claims that she hasn't. But even if she did, accepting that, she followed up on the January 9th document up through July 2020. Holt, who was a local HR representative on April 7 of 2020, follows up with Stacey Waters to see if the hardship transfer will go through if the investigation is founded. That's inconsistent. March 2, 2020, Holt calls Cuff to see if she's still interested in the transfer. That's inconsistent. Holt, once again, that's a DOT person. Jim Hall, another DOC person, late January, tells Brandy that the investigation is going to determine the fate of her hardship transfer. Ty Stanton ends up telling, and this is after, I'm not sure when, but this is after the January 9th document. He tells Investigator Waters in her testimony that he calls in and he says, look, we're going to do this transfer depending on the investigation. How's the investigation going? Let me ask you a question. If we were to agree with you and vacate the summary judgment and go back, what do we do to the Ehlers-Faragher, the fact that there is arguably an affirmative defense here? Do we do anything with that or we leave that for the trial court? No, I believe we leave that for the trial court. Okay. And furthermore, I mean, even if you were to look at it and find a resignation, it's clear that it's not voluntary. There's a coercion defense. She references the coercion issues in that resignation. Can you explain to her what some of the consequences would be, or at least the documents, had she read them, would have explained that there are real consequences if you do decide to resign? No, and that's an interesting point because the explanation that she got was misleading. It told her she needed to have it to go through the hardship transfer. There was also a form document that was offered to her, which was a flat transfer, and she didn't do that because that, I mean, a flat resignation. She didn't want to resign. She wanted to not continue working while she was off on leave, while the hardship transfer went through. And then the information she had at that point in time, and Stacey Waters confirmed this, is it's typically seven days to two weeks. And they strung this woman along for six months, and then she never got a document telling her that it was denied. We finally got that in depositions from Director Ty Stanton a couple of years ago. So, you know, it's not voluntary, and it's not a resignation, and neither side acted like it was until the DOC decided we're done with her. What do you say, from a legal standpoint, regarding Judge Brand's view that her affidavit was self-serving and therefore should not be credited? I appreciate you bringing that up. That's one of the huge issues that we deal with as Plaintiffs' Counsel, because we find the self-serving issue pops up against plaintiffs all the time. It doesn't against defendants, and if the end result, even if that is weighing of evidence, it's not self-serving. It's corroborated by documents, and I've referred to them. It's corroborated by Stacey Waters. Well, that doesn't mean, the fact it's corroborated doesn't mean it's not self-serving. I mean, any time you say that something happened, you know, and it's adverse to you, it's going to be self-serving. Was he right as a matter of law to make that conclusion? He was not. What's wrong with that conclusion? Is that it is not self-serving. It's what happened, and the only way she can get that in the evidence is by saying what happened, and in the cases where courts have been affirmed for doing that, and it bothers me, but there's been no other independent support in the record, and there is independent support from the witnesses that I'd mentioned as well as the documents that I'd referred to. Isn't the real problem that the law is that conclusory self-serving affidavits are to be discounted, if you will, and your contention is these are factual as compared to conclusory. Yes, it was a 250-page deposition that was video recorded. Judge Roth, do you have anything more? I have nothing further. Okay, great. Thank you, Your Honors. Okay, thank you, counsel. We'll get you on rebuttal. Okay. Take your time. Sorry. We're on the clock, so it's okay. Hi. May it please the Court, my name is Hannah Cogan, and I'm an Honors Fellow with the Office of Attorney General, and I'm here representing the Department of Corrections. This court should affirm because there is no genuine dispute of material fact that Ms. Cuff voluntarily resigned on January 9th, and she also failed to demonstrate that SCI Muncie, a state prison for female inmates, was a hostile work environment. Can we go back to the voluntarily resigned? Sure. But as your opponent mentioned, she followed up nine times regarding her transfer. She obviously believed that this resignation was not effective to negate her transfer request. Did she not? So how do you say there's no genuine issue of fact? Because before those nine times or contemporaneously, she signed the notarized document and said, quote, this letter serves as my official notice of resignation. And well, shouldn't a jury decide whether that was conditional upon the existence of her transfer request? No, Your Honor. She also turned in her uniform, and then she received a confirmation of her resignation from the DOC saying, thank you for your service to the Commonwealth and good luck with future endeavors. And then weeks later, filed for unemployment. But you're deciding that. Shouldn't a jury decide that? It would be unreasonable for a jury to conclude that someone who does a letter saying, I officially put in my notice of resignation, hands in her uniforms, and files for unemployment, and doesn't go to work, doesn't show up for work, believes she's still employed. Wasn't going to go back to the place that she had such horrible experiences. But shouldn't a jury be the one to decide these things? We're supposed to look at the facts in the light most favorable to the plaintiff. You're looking at them in the light most favorable to your client. But there was nothing to contradict or dispute that this was a voluntary resignation, that that letter in itself was a resignation to the DOC. But she, but the, okay, you can have a resignation, it's conditional upon your not getting, getting the transfer. And that was her understanding. But nothing. We're arguing. I guess I'm confused, Your Honor. It might happen in a jury room, aren't we? No, Your Honor, because there's, that may be what she believed, but nothing in the letter says anything about her hardship transfer. What about the subsequent letters that Mr. Cochran has just mentioned? The series of letters over months that she received that she wouldn't have received if she had resigned and completely terminated her contact with the DOC? She was talking to central office and a group of personnel that were handling the hardship transfer, not her resignation. It really indicates bureaucratic dysfunction, unfortunately, on the part of DOC. But she handed in her resignation to Roberta Boyles, who is at SCI Muncie. That then, she reports to someone at SCI Cole Township, who then refers to central office. This is the state, unfortunately, it is a bit bureaucratic, but they were unaware at the time that she had even resigned for several weeks. So some of those calls, they didn't know she had actually resigned until later and talking to other personnel at other facilities. It is unfortunate, but it's this bureaucracy that is there and they didn't know what to do with the hardship transfer request after she resigned. It was unusual, yes, and they were concerned about what was written in the hardship transfer request regarding the workplace. They wanted to make sure that the EEO was investigating that. That is part of why they kept it open. That is part of Christopher Lynn's deposition. He says exactly why it was kept open, to make sure that her claims or allegations regarding the workplace were being investigated, but not anything regarding the hardship transfer request. Let's go back to the hostile work environment. Judge Brand found that the things that occurred to her were not necessarily gender related. I'm having great difficulty with that. Could you address all of these or each of these and tell me how they're not gender related? Sure, Your Honor. So at this point, we would say that the two instances where she was allegedly called a bedazzled twat, that term does have, we've conceded that that is in regards to a How about her, that she was sleeping with someone? How about the fact that her feminine products were taken? These things really have to do with the fact that she's a woman, don't they? Sure, Your Honor, but that may be five instances over the course of eight months. That's not severe or pervasive by any means under Title VII. And other instances where a comment was made regarding non-compliance with her uniform, that can be made to someone of any gender, not just a woman. The fact that she believed otherwise, it's still not because of her sex. Just because it is made to a woman does not mean that it is because she is a woman. I would also note that one of those instances of the bedazzled twat was at a union meeting, which she was not in attendance for, and her name was not actually said. Yes, there was some kind of implied reference that it was in regards to her, but she was not there and it was at a union meeting. There's no respondent superior for my client for what goes on at a union meeting off-site. And again, even if you took Judge Brand's eight instances, if you accept Judge Brand's eight circumstances or events as related to her sex that he considered, again, it's eight instances over the course of eight months. What's your best case to support that that's not pervasive or severe? I mean, seven months is a pretty short time frame, and having eight or so instances, eight or ten instances over seven months, that's a lot, isn't it? It's not, Your Honor. The cases have largely been where it is on a weekly or daily basis. Both, I believe, Spain and Farragher are ones that come to mind. But I would also say, too, that the last instance was in She then looked to do the hardship transfer request on January 6th, and then two days later, or three days later, resigned January 9th. That's quite a gap and does not indicate any kind of pervasiveness or continuous hostility at the workplace. I do want to just address very quickly the issue. I'm interested in that. Thank you. Sure. How do we get around that? There are two rules that arguably apply here. First off, which rule would apply if either, I guess? Your Honor, it would be Rule 6B-1B. That rule specifically outlines the exact circumstances that work occurred here. When the deadline has passed, which it had, and you do want to seek extended time to file a motion, you have to ask the court and show excusable neglect. We did file the motion five months after the deadline. However, even as my friend on the other side has said, there was no have a trial date. It was sitting essentially for five months. But haven't we said that the district court has to make a finding regarding excusable neglect? The district court granted the motion, and I would say yes, summarily did so, but implicit there is that he said, yes, there was excusable neglect. Isn't there a threshold for each of the two rules? I mean, matter which, there was no finding at all, good cause or excusable neglect. I mean, how do we get around that? Because, yes, it was not articulated by the district court, but if you were to read it. I understand that if we were to send it back, it would just come back here on this exact same record. We'd be doing the same thing. That's exactly what I was going to say. But nonetheless, I mean, the rules are there for a reason. Yes, Your Honor, but there's also something to be said for judicial efficiency here in economy. If you were to remand it back, if it were to proceed to trial, we'd be looking at Rule 50 motions or JNOB. We'd be coming back. We'd be looking at the merits again, just as we did already. And he did have a chance to oppose the motion for summary judgment, which he did. And we'd be right back where we are right now. So there is something to be said for judicial efficiency there as well. And I would, again, say that the standard there is a abuse of discretion, and district courts do have pretty wide-ranging discretion to manage their own courts' docket. And Your Honor, I believe you mentioned as well the affirmative defense of corrective action. I just want to say that you can reach that issue here. This court can affirm for any grounds supported by the record. It was raised below, although it was not reached by the district court because the district court found it unnecessary to do so. This court may reach that issue. So we don't believe that there was any... What preventive action was taken? There was. They started an investigation, but they never... Do we have that they sat down with anyone and said, stop doing this? Yes. Stacey Water conducted a very thorough investigation and reached the conclusion that there was the one incident at the union meeting regarding the Bedazzled Squat comment. That was all that she... But an investigation is not necessarily corrective action to say to these people, stop doing this. In fact, Department of Corrections, the people at Muncie weren't cooperative, were they? What do we have in the record that says, in fact, if you want us to rule on it, maybe we rule that you didn't make out that defense. Your Honor, you are entitled to make that ruling. However, we would urge the court not to do so because there was nothing left that the DOC could do. Sergeant Rippey, who is the only one that was complained of and the events were corroborated by the EEO investigation, had retired. There was nothing left for the DOC to do at that point in terms of disciplinary action. They can't take any kind of disciplinary action on an employee that no longer works for them. If you don't have anything more... Yeah, if there are no further questions, I'm happy to sit down. Judge Roth, do you have anything more? Nothing further. Thank you. Nor do I. Thank you. Thank you. And we'll hear rebuttal. Thank you, Your Honor. Just very briefly, there was a reference made to the return of uniforms. That was because Boyle, who we've said misled her all along, told her to return the uniforms, that she would need new uniforms going to a new correction facility. Rule 6 and 16, both of them, it is judicial discretion, but those rules set the limits on that discretion. And that's all I have, unless Your Honors have any questions for me. Judge Roth, do you have anything more? Nothing further. Thank you. Okay, great. Thank you, counsel. Thank you, Your Honors. We thank both counsel for their excellent briefing and oral argument. We'll take this case under advisement. I'd like to...